OPINION
{¶ 1} Defendant-appellant, Tina M. McDowell, appeals from the judgment of the Franklin County Court of Common Pleas, whereby the trial court convicted appellant of aggravated murder, aggravated robbery, and tampering with evidence, pursuant to a jury trial.
 {¶ 2} The Franklin County Grand Jury indicted appellant on one count of aggravated murder, in violation of R.C. 2903.01, alleging, in pertinent part, that appellant purposely caused another's death while committing or attempting to commit aggravated robbery. The aggravated murder charge contained a death penalty specification under R.C. 2929.04(A)(7), alleging, in pertinent part, that appellant committed the aggravated murder while committing or attempting to commit aggravated robbery and that appellant acted as the principal offender in the commission of the aggravated murder or, if not the principal offender, with prior calculation and design.
 {¶ 3} The grand jury also indicted appellant on another count of aggravated murder, alleging that appellant purposely caused another's death with prior calculation and design. The second aggravated murder count also contained a death penalty specification, alleging as above.
 {¶ 4} Lastly, the grand jury indicted appellant on one count of aggravated robbery, a first-degree felony, in violation of R.C. 2911.01, two counts of robbery as second and third-degree felonies, in violation of R.C. 2911.02, and one count of tampering with evidence, a third-degree felony, in violation of R.C. 2921.12.
 {¶ 5} The above six counts stemmed from Lutrecia Brown's death during the early morning hours of December 15, 2002. The grand jury also indicted appellant's co-defendant, Tracy Campbell, with the above offenses and specifications, but Campbell agreed to testify against appellant in exchange for plaintiff-appellee, the State of Ohio, allowing Campbell to plead to aggravated robbery and complicity to involuntary manslaughter for a total sentence of 18 years imprisonment.
 {¶ 6} Appellant pled not guilty to the above charges, and a jury trial commenced. In the course of proceedings, appellee dismissed the two robbery counts.
 {¶ 7} Shawn Feasel testified to the following on appellee's behalf. During the evening of December 14, 2002, and the early morning hours of December 15, 2002, Feasel attended a party at Larry Campbell and Robin Schoenberger's home ("Campbell/Schoenberger home"). The partygoers where drinking alcohol and smoking crack cocaine. Appellant attended the party, although appellant and her friend left the party periodically. At one point, the partygoers contributed money for Schoenberger to buy additional crack cocaine. When appellant contributed money for the crack cocaine purchase, a $1 bill that she provided was completely covered with blood.
 {¶ 8} On cross-examination, Feasel admitted to having a felony drug conviction, several theft convictions, and a falsification conviction. Feasel also admitted that he had a warrant pertaining to his failing to appear for a jail sentence on a misdemeanor conviction, and that he hoped that appellee would help him "take care of that warrant." (Vol. 5 Tr. at 124-125.) Lastly, Feasel confirmed that, when he spoke with police about the events of December 14 and 15, 2002, he did not inform police that he and the partygoers were smoking crack cocaine.
 {¶ 9} Brown's daughter, Christina Brown, also testified for appellee. Christina testified that she worked at a bar with appellant and that, on December 14, 2002, appellant left work early around 10:00 or 10:30 p.m. because she claimed that she was feeling ill.
 {¶ 10} Tracey Campbell also testified on appellee's behalf. Campbell confirmed that she received the above noted plea bargain, and Campbell testified as follows. Campbell befriended appellant and they would use crack cocaine together. Approximately one month before the December incident, Brown accused appellant of stealing money from her and Brown threatened to stab appellant. Appellant subsequently admitted to Campbell that she stole money from Brown and said that she would try to steal more money.
 {¶ 11} On the evening of December 14, 2002, appellant and Campbell attended the crack cocaine party at the Campbell/Schoenberger home. Larry Campbell is Tracey's father. Brown also attended the party, and when Brown decided to leave, appellant and Campbell decided to walk Brown to her home, which was in the neighborhood. Appellant and Campbell planned to steal money from Brown; appellant and Campbell needed money to purchase crack cocaine at the party.
 {¶ 12} At Brown's home, the three individuals drank more alcohol. When Brown went to the kitchen, appellant whispered to Campbell that they were going to have to kill Brown. Next, Campbell approached Brown and hit her on the back of the head with a 40-ounce bottle. Brown fell to the ground and appellant sprayed mace at Brown; Campbell had given appellant the mace earlier because appellant was supposed to engage in prostitution later that morning and would need the mace for protection. Next, while appellant was on top of Brown, Campbell sprayed appellant and Brown with a fire extinguisher. During the struggle, Campbell saw appellant hit Brown approximately four times with a lamp and saw appellant use her foot to stomp on Brown. The fight continued in the bedroom between Brown and appellant while Campbell looked for money in the kitchen. Thereafter, appellant came out of the bedroom and was bleeding from a hand wound.
 {¶ 13} According to Campbell, appellant and Campbell then returned to the party, and appellant handed Campbell $60 for a drug purchase. One of the $20 bills contained bloodstains. Later, when the individuals at the party needed more money for drugs, appellant and Campbell returned to Brown's home. Appellant and Campbell rummaged through Brown's home and through Brown's pockets to look for money. At that time, Campbell noticed that Brown was dead. Campbell and appellant again returned to the party and, at some point, appellant told Campbell that she stabbed Brown in the heart.
 {¶ 14} Afterwards, appellant and Campbell concocted an alibi and agreed to tell police that appellant was engaging in prostitution when the murder occurred and that she injured her hand by tripping over some brush and falling on glass shards. Thus, when Campbell originally spoke with police, she did not tell police the whole truth and, at one point, relayed the concocted alibi. However, Campbell verified that she ultimately told police the same version of events that she told the jury. Campbell also admitted that she concealed the fire extinguisher. On cross-examination, Campbell denied telling fellow inmate Jessica Thompson that she stabbed Brown.
 {¶ 15} Clinton Township Police Lieutenant John Clark testified on appellee's behalf that, when he spoke with Campbell at approximately 6:00 p.m. on December 15, 2002, Campbell showed no visible signs that she was involved in a struggle. Clark also testified that when he arrested appellant on December 22, 2002, he noticed that appellant's shoe prints matched a shoe print embedded on Brown's chest, and he noticed that appellant had a wound on the palm of her hand.
 {¶ 16} Keith Williamson, from the Ohio Bureau of Identification and Investigation, also testified for appellee. Williamson testified that law enforcement found a knife underneath the porch of the Campbell/Schoenberger home.
 {¶ 17} Daniel Davison, a forensic scientist from the Ohio Bureau of Identification and Investigation, testified for appellee. Davison reviewed the shoe print embedded on Brown's chest and compared it to the shoes that appellant wore when arrested. Davison opined that the shoe print embedded on Brown's body matched the print from appellant's shoes.
 {¶ 18} Dr. Robert Belding from the Franklin County Coroner's office testified that Brown died from a "laceration of the left anterior descending coronary artery due to sharp force injury to the torso." (Vol. 5 Tr. at 171.) Dr. Belding also testified that appellant's hand wound was consistent with someone stabbing Brown in the rib cage and having the hand slide down the blade in the process.
 {¶ 19} Lastly, before appellee rested its case-in-chief, the parties stipulated that law enforcement found appellant's blood in Brown's home, including on a jewelry box in Brown's bedroom. The parties also stipulated that the knife law enforcement discovered contained Brown's blood.
 {¶ 20} Jessica Thompson testified on appellant's behalf. Thompson was incarcerated with appellant and Campbell while Thompson awaited proceedings for her attempted murder and felonious assault charges. Thompson testified that Campbell confessed to slashing Brown, but indicated that it was an accident.
 {¶ 21} Appellant testified to the following on her own behalf. Appellant admitted to previously stealing money from Brown and recalled being afraid of Brown because Brown threatened to harm her. On the evening of December 14, 2002, appellant was working at a bar as a dancer. Appellant left work early because she was experiencing sharp pain and bleeding from having recently undergone surgery. Because she left early, her employer did not pay her as much money as she would have otherwise received.
 {¶ 22} After she left work, appellant went to the party at the Campbell/Schoenberger home. She arrived between 10:30 and 11:00 p.m. Appellant acknowledged that the partygoers were smoking crack cocaine. Appellant was hesitant in acknowledging the drug use, claiming that she was still getting used to people knowing that she was an addict. At the party, appellant contributed to the purchase of some cocaine, and appellant smoked the crack cocaine.
 {¶ 23} Brown and Campbell also attended the party. At one point, around 1:00 a.m., Brown decided to leave. Appellant and Campbell decided to walk Brown to her home, which was in the neighborhood. When the individuals arrived at Brown's home, they drank alcohol. In the course of events, Campbell accused Brown of flirting with Campbell's boyfriend. Brown became upset and then suddenly recalled that appellant stole money from her. In response, appellant pushed Brown and a fight ensued. Brown hit appellant in the nose, and appellant's nose started to bleed. Appellant hit Brown with a beer bottle on the back of Brown's head. The fight continued, and Brown pulled appellant's hair and punched her in the stomach. At one point, appellant stomped on Brown because she was mad at her. Campbell then hit Brown and appellant with a fire extinguisher. Campbell also hit Brown in the head with a lamp.
 {¶ 24} Meanwhile, appellant left to get help from Schoenberger. Schoenberger was not available, and appellant returned to Brown's home. When appellant returned, appellant saw Campbell stab Brown with a knife. Appellant grabbed the knife from Campbell, and appellant sliced her own hand. Appellant hid the knife underneath the porch of the Campbell/Schoenberger home.
 {¶ 25} Thereafter, appellant and Campbell decided to concoct an alibi whereby they would tell police that Campbell was sitting near a bar where appellant was meeting someone for prostitution. Appellant relayed the alibi to police at one point. Eventually, appellant told police about the incident at Brown's home, stating that Campbell stabbed Brown, and appellant told police where she concealed the knife.
 {¶ 26} On cross-examination, appellee elicited, with no objection, testimony concerning appellant having six children who did not live with her because of her drug use. Appellee also had appellant admit, with no objection, that people have known for years that she had a drug problem.
 {¶ 27} Next, appellee had appellant admit, with no objection, that her children have different fathers. Appellee then asked who the fathers were, with no objection, and appellant responded, noting also that her ex-husband was taking a paternity test to determine paternity for her second and third child. Appellant also admitted to having a conviction for unauthorized use of property, a theft offense.
 {¶ 28} Thereafter, appellee asked appellant the following questions, with no objection:
Q. Now, when you were talking to the police, you referred to Robin as a crack whore?
A. Yeah.
Q. And that's someone who prostitutes themselves either for crack or cheaply for money to buy crack?
A. That's correct.
Q. And you were doing the same thing at that time, correct?
A. No, that's incorrect.
Q. Do you remember having a conversation with the police about which men and which races and which nationalities pay the best?
A. Yeah.
Q. You remember telling them that Mexicans were the best payers?
A. I probably said that.
Q. And that blacks were the worst, they only wanted to give you ten bucks?
A. I mean, if that's what I said, that's what I said.
(Vol. 10 Tr. at 16.)
 {¶ 29} Appellee reiterated the above questions without objection when asking whether the above conversation took place during a tape-recorded interview. Appellant also admitted to appellee, with no objection, that she told police that Schoenberger would become upset at her for not getting enough money for her prostitution. Appellant also admitted, with no objection, that she told police she had no trouble getting money because she could always get money from prostitution. Likewise, appellant admitted, with no objection, that she told police she liked men with nice cars because they paid well and that she could sometimes get $100 for prostitution, but would go as low as $20 for prostitution.
 {¶ 30} Although appellant denied, on cross-examination, that she displayed bloodstained money at the December party, she acknowledged that she told police she had bloodstained money after the incident. Appellant explained this discrepancy by stating that she lied to the police about the bloodstained money.
 {¶ 31} Thereafter, appellant admitted that she originally told police she thought that Schoenberger was to blame for Brown's death. Specifically, appellee asked appellant:
Q. They flat out asked you, "Who do you think did this?" And you said "Robin;" isn't that correct?
A. If that's what it says, then I guess that's what I said.
(Vol. 10 Tr. at 54.)
 {¶ 32} Thereafter, appellee asked the following question about the concocted alibi:
Q. So why wouldn't the alibi have been to help [Campbell] not be the murderer?
A. Because all the evidence points to me.
(Vol. 10 Tr. at 82.)
 {¶ 33} Brandy Krouskop testified during appellee's rebuttal case. Krouskop was incarcerated with appellant while awaiting proceedings for child endangering charges. Krouskop testified that she overheard appellant confess to committing the murder as charged.
 {¶ 34} Campbell testified again during appellee's rebuttal case. Campbell testified that, on July 20, 2003, she read a poem to fellow inmates during a talent contest that the inmates performed for entertainment. In the poem, Campbell stated: "I am charged with a murder that I did not do." (Vol. 10 Tr. at 166.)
 {¶ 35} Debra Maynard also testified during appellee's rebuttal case. Maynard testified that she had custody over three of appellant's children and that, on December 16, 2002, Maynard went to appellant's home to have her sign a paper regarding one of appellant's sons changing his last name to Maynard. When Maynard saw appellant on that day, Maynard noticed no injuries to appellant's nose.
 {¶ 36} During closing arguments, one of appellant's defense attorneys stated the following:
* * * You know, this isn't a case that [appellant] is a bad mother. She has six kids and none of them live with her, and some are in foster care and some are adopted out. * * * The judge is not going to read you anything that talks about that stuff. This is just: Let's make Tina look bad.
* * * And to hear more information about that can only cause me to assume that it's being offered or talked about just to make her look bad in your eyes for something that's absolutely irrelevant to any issue in the case.
(Vol. 11 Tr. at 56-57.)
 {¶ 37} Appellee responded during its rebuttal portion of closing argument:
And you know, the defense attorney says I bring up the fact that she has six children that are not in her custody to demean her as a person. No. No. But she said this to you. I'm still getting used to letting people know I'm a drug addict. * * * So we brought up the six children that are in other people's custody. And she admitted it's because of her drug use.
So, all she's been used to is people knowing about her drug problem, from the courts to all the people that have her children, to all the men that fathered those children. Everybody knows that [appellant] is a crackhead. [Appellee] doesn't have to make [appellant] look bad. [Appellant] did that all by herself.
(Vol. 11 Tr. at 96-97.)
 {¶ 38} Appellee also argued during its rebuttal portion of closing argument:
* * * [Appellant] came up with this alibi to alibi herself right after it happened. She didn't know what the evidence was that was left behind. She didn't know about the shoe print. She didn't know about where her blood was * * *.
(Vol. 11 Tr. at 110.)
 {¶ 39} Lastly, appellee stated:
[Appellee] does not need to prove motive. * * * But the motive is clear here. Money, money, money, money, money. Money, money, money. Feed the hungry drug monster. And when you have a habit, it takes you over. And it took [appellant] over that night. And all the evidence, all the evidence points to [appellant].
(Vol. 11 Tr. at 112.)
 {¶ 40} After deliberations, the jury found appellant guilty of aggravated murder based on appellant purposely causing Brown's death while committing or attempting to commit aggravated robbery. The jury also found appellant guilty of the accompanying death penalty specification. Next, the jury found appellant guilty of aggravated robbery and tampering with evidence. The jury found appellant not guilty on the aggravated murder charge pertaining to appellant purposely causing Brown's death with prior calculation and design. However, as to the latter aggravated murder count, the jury found appellant guilty on a lesser-included offense of murder.
 {¶ 41} Because the jury found appellant guilty on a death penalty specification, the case proceeded to a sentencing phase wherein the jury would have to decide whether to impose the death penalty. After the parties presented evidence and arguments during the sentencing phase, the jury decided the following:
We, the jury, having reached a deadlock on whether the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt, hereby unanimously find the following life sentence * * *. Life imprisonment with parole eligibility after 30 full years. * * *
(Vol. 12 Tr. at 210.)
 {¶ 42} The trial court imposed the jury's recommended sentence on the aggravated murder charge after merging the murder conviction into the aggravated murder conviction. The trial court also imposed three years imprisonment on the aggravated robbery conviction and one year imprisonment on the tampering with evidence conviction. The trial court ordered appellant to serve the sentences consecutively.
 {¶ 43} Subsequently, appellant instituted an appeal, filing an original merit brief and a supplemental merit brief by leave of court. In the original merit brief, appellant raises two assignments of error:
ASSIGNMENT OF ERROR NO. 1:
The jury guilty verdicts were against the manifest weight of the evidence.
ASSIGNMENT OF ERROR NO. 2:
The sentence recommended by the jury was not supported by [t]he evidence and was contrary to law pursuant to the June 24, 2004 decision of the United States Supreme Court in [Blakely v.Washington] (2004), [542] U.S. [296], 124 S.Ct. 2531.
In her supplemental brief, appellant raises three assignments of error:
ASSIGNMENT OF ERROR NUMBER ONE
The defendant was deprived of her constitutional right to a fair trial and due process of law when the state improperly introduced evidence of other bad acts and improper character evidence in its effort to improperly impeach the credibility of the defendant.
ASSIGNMENT OF ERROR NUMBER TWO
The defendant was denied her constitutional right to the effective assistance of counsel due to the failure of counsel to object to the improperly introduced evidence of other bad acts and improper character evidence.
ASSIGNMENT OF ERROR NUMBER THREE
The defendant was deprived of her right to a fair trial and due process of law based upon the state's misconduct, in a death penalty case, when it improperly introduced evidence of other bad acts and improper character evidence.
 {¶ 44} We begin with appellant's first, second, and third supplemental assignments of error. In these assignments of error, appellant challenges appellee's elicitation of testimony concerning: (1) appellant's long-term drug problems; (2) appellant's prostitution and prior statements concerning her prostitution; and (3) appellant's children having different fathers. Appellant argues that such testimony constituted plain error and prosecutorial misconduct, and appellant contends that her defense attorneys rendered ineffective assistance when they failed to object to appellee eliciting such testimony. We disagree.
 {¶ 45} As appellant recognizes, her defense attorneys' failure to object to appellee eliciting the above testimony waives all but plain error. State v. Barnes (2002),94 Ohio St.3d 21, 27. Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." We notice plain error "`with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" Barnes at 27, quoting State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus. "By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial." Barnes at 27. Under the plain error standard:
* * * First, there must be an error, i.e., a deviation from a legal rule. * * * Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * * Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial. * * *
Id.
 {¶ 46} Although appellant also frames appellee's elicitation of the above testimony as prosecutorial misconduct, we note that appellant's defense attorneys failed to object to the purported acts of prosecutorial misconduct, and, again, appellant waived all but plain error on the issue. State v. Smith,97 Ohio St.3d 367, 2002-Ohio-6659, at ¶ 45, citing State v. Slagle (1992),65 Ohio St.3d 597, 604; see, also, State v. Bray, Lorain App. No. 03CA008241, 2004-Ohio-1067, at ¶ 11 (recognizing that, "[w]hen the defendant fails to object to the purported acts of prosecutorial misconduct, he waives all but plain error").
 {¶ 47} Lastly, in regards to appellant's ineffective assistance of counsel claim, the United States Supreme Court established a two-pronged test. Strickland v. Washington
(1984), 466 U.S. 668. First, the defendant must show that counsel's performance was outside the range of professionally competent assistance and, therefore, deficient. Second, the defendant must show that counsel's deficient performance prejudiced the defense and deprived the defendant of a fair trial. A defendant establishes prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 {¶ 48} As indicated above, the plain error standard "is generally an almost insurmountable obstacle to reversal." Statev. Seeley (2002), Columbiana App. No. 2001 CO 27, citing Statev. Carpenter (1996), 116 Ohio App.3d 615, 621. The plain error standard differs from the ineffective assistance of counsel standard. Seeley; State v. Murphy (2001), 91 Ohio St.3d 516,559 (Cook J., concurring). As noted above, under the ineffective assistance of counsel standard, "a defendant is prejudiced by counsel's deficient performance when there is a reasonable probability that the outcome would have been different but for the error." Seeley, citing Strickland.
 {¶ 49} We first address appellant's challenge to appellee eliciting testimony about appellant's long-term drug use. We determine that this claim stems from appellee having appellant admit that: (1) her six children no longer live with her because of her drug use; and (2) people have known for years that appellant had a drug problem. Appellant contends that such testimony had no relevance to whether she committed the charged crimes, but, rather, prejudiced the jury by characterizing her as a bad person.
 {¶ 50} Evid.R. 404(B) provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive * * *.
 {¶ 51} Motive is generally relevant in all criminal trials, even though the prosecution need not prove motive in order to secure a conviction. State v. Henry, Franklin App. No. 04AP-1061, 2005-Ohio-3931, at ¶ 42. Here, appellee sought to demonstrate that appellant committed the aggravated robbery and aggravated murder through a motive to obtain money for a crack cocaine binge at the December 2002 party. The testimony about appellant not having custody over her children because of her drug use, and the testimony about people knowing for years that appellant had a drug problem, explained the seriousness and depth of appellant's drug addiction, which, during direct examination, appellant herself admitted to having. In this regard, pursuant to Evid.R. 404(B), the above testimony aided appellee's theory on appellant's motive to commit the charged crimes. See, e.g.,State v. Davis, Clark App. No. 2002-CA-43, 2003-Ohio-4839, at ¶ 96 (relating a defendant's previous drug activity to a motive to commit the charged crimes). Accordingly, appellee's elicitation of the above noted testimony did not rise to the level of error, let alone plain error, and appellant's defense attorneys did not render ineffective assistance by not objecting to the questions that elicited such testimony.
 {¶ 52} We next address appellant's challenge to testimony concerning appellant's prostitution and her statements concerning her prostitution. As noted above, Campbell testified that appellant was going to engage in prostitution after the December party. Likewise, appellee had appellant admit to statements she made to police regarding her prostitution. Specifically, as noted above, appellant admitted to telling police about which particular race and nationality paid the best and worst for prostitution. Moreover, appellant verified telling police that Schoenberger would become upset with appellant for not getting enough money for her prostitution. In addition, appellant affirmed that she told police that she had no trouble getting money because she could successfully prostitute. Furthermore, appellant admitted to telling police that men with nice cars paid well for prostitution, and that she could get as much as $100 for prostitution, but that she would go as low as $20.
 {¶ 53} Possibly, appellee elicited the above testimony to refute appellant's claim that she did not prostitute to support her drug addiction, which we recognize would have been an attempt for appellee to aid its theory that appellant had a dire need to rob and murder Brown to obtain money to support her crack cocaine binge. Alternatively, appellee possibly elicited the above testimony to try to impeach appellant's credibility by pointing out that appellant once provided inconsistent information to police through an alibi that suggested she was not present for Brown's murder because she was engaging in prostituting. Regardless, when appellee elicited the above admissions from appellant, appellee did not provide the full context as to what appellant told police when she made the statements. Thus, we cannot fully evaluate the context of the statements and proper purpose for the statements.
 {¶ 54} Nonetheless, even if we were to assume the inadmissibility of the above testimony, we note that appellee did not infuse the prostitution issue as an underlying theme of the trial. As an example, appellee made no mention of appellant's prostitution during voir dire, opening statement, or rebuttal case. Likewise, during its case-in-chief, appellee did not deluge the jury with information about appellant's prostitution activity; rather, appellee limited the prostitution evidence during its entire case-in-chief to: (1) Campbell making an isolated statement about giving appellant the mace that appellant used during the incident because appellant was going to engage in prostitution later; and (2) Campbell confirming that she and appellant concocted an alibi regarding appellant engaging in prostitution when the murder occurred. Furthermore, we find significant that, during closing arguments, appellee did not state anything about appellant's prostitution, other than to repeat appellant's own prior inconsistent statements regarding her alibi.
 {¶ 55} Lastly, despite the prostitution testimony, appellee presented ample evidence that supported appellant's convictions. See State v. Knott, Athens App. No. 03CA30, 2004-Ohio-5745, at ¶ 1, 25, 29 (refusing to find plain error or ineffective assistance of counsel despite the introduction of inadmissible evidence because the prosecution presented ample evidence of the defendant's guilt).
 {¶ 56} As noted above, the trial court, pursuant to a jury trial, convicted appellant of aggravated murder, in violation of R.C. 2903.01(B), with a death penalty specification under R.C.2929.04(A)(7). Under R.C. 2903.01(B):
No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery * * *.
Under R.C. 2929.04(A)(7), the death penalty specification applies if:
The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit * * * aggravated robbery * * * and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.
 {¶ 57} Additionally, the trial court, pursuant to a jury trial, convicted appellant of aggravated robbery, under R.C.2911.01, which is an underlying offense on the aggravated murder conviction. Under R.C. 2911.01(A):
No person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall do any of the following:
(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
(2) Have a dangerous ordnance on or about the offender's person or under the offender's control;
(3) Inflict, or attempt to inflict, serious physical harm on another.
 {¶ 58} Here, appellee presented ample evidence beyond a reasonable doubt that appellant was guilty of aggravated murder with the specification and aggravated robbery. Indeed, appellant even admitted that "all the evidence points to [her]." (Vol. 10 Tr. at 82.) In so concluding, we first note that the evidence established that appellant, as a principal offender, caused Brown's death. In particular, appellant told Campbell that they were going to have to kill Brown while they were at Brown's home during the early morning hours of December 15, 2002. Brown died from a stab wound to her heart. The jury could infer that appellant inflicted the wound with a knife upon considering evidence of appellant's violent conduct toward Brown, evidence that was provided through Campbell's testimony and through evidence that appellant's shoe print was embedded on Brown's chest, and upon considering Dr. Belding's testimony that appellant's hand wound would be consistent with a person stabbing another in the rib and having the person's hand slide down the blade in the process. Moreover, appellant confessed to committing the murder to Campbell and subsequently in front of Krouskop.
 {¶ 59} Continuing our analysis of the aggravated murder charge, death penalty specification, and aggravated robbery charge, we next note that the evidence demonstrated that appellant caused Brown's death while committing or attempting to commit a theft offense, considering that: (1) Campbell admitted that she and appellant were going to steal money from Brown during the early morning hours of December 15, 2002; (2) law enforcement found appellant's blood on Brown's jewelry box; and (3) appellant displayed bloodstained money when she returned to Larry Campbell and Robin Schoenberger's party.
 {¶ 60} Appellee also presented ample evidence to support appellant's tampering with evidence conviction under R.C.2921.12, which states that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]" The tampering with evidence statute applies even if no formal proceedings had commenced at the time the defendant tampered with the evidence. State v. Moore (Jan. 20, 1992), Scioto App. No. 91CA1966; State v. Copley, Franklin App. No. 04AP-511, 2005-Ohio-896, at ¶ 59. Here, appellant's involvement in the incident against Brown triggered cause for appellant to know that law enforcement would investigate the incident and would be interested in the knife. Nonetheless, by her own admission, appellant concealed the knife. The tampering with evidence occurred when appellant concealed the knife; her subsequent cooperation with police by informing them where she hid the knife did not negate her culpability. See State v.Stewart (Apr. 15, 2002), Stark App. No. 2001CA00033.
 {¶ 61} Thus, for the above reasons, even if we were to assume the prostitution testimony's inadmissibility, we conclude that the admission of such testimony did not rise to the level of plain error because the evidence did not affect the outcome of the trial. In addition, for the above reasons, we conclude that appellant's defense attorneys did not commit ineffective assistance by failing to object to the testimony because there was no reasonable probability that the outcome of the trial would have been different but for the testimony.
 {¶ 62} Lastly, we address appellee eliciting from appellant that she had six children from different fathers and that her ex-husband was having a paternity test to determine whether he was the father of two of those children. Finding no plausible explanation for such evidence, we deem the evidence irrelevant and inadmissible. Evid.R. 401 and 402.
 {¶ 63} However, we again note that appellee did not infuse the above issue as an underlying theme of the trial. The testimony about the different fathers to appellant's six children stemmed only from a few questions to appellant during cross-examination, and appellee did not mention such evidence during voir dire, opening argument, its case-in-chief or during its rebuttal case. Likewise, we find significant that, although appellee mentioned the different fathers during its rebuttal closing argument in response to appellant's closing argument, appellee ultimately emphasized that the jury should convict appellant on the evidence and on appellant's motive to obtain money for crack cocaine. As such, we determine that the above testimony did not taint the jury, and we reiterate that appellee otherwise provided ample evidence to support appellant's convictions. See Knott at ¶ 1, 25, 29. Thus, we conclude that the admission of testimony concerning the different fathers to appellant's children did not rise to the level of plain error because the evidence did not affect the outcome of the trial. Moreover, appellant's defense attorneys did not commit ineffective assistance by not objecting to the testimony because there was no reasonable probability that the outcome of the trial would have been different but for the testimony.
 {¶ 64} Therefore, the above alleged errors did not rise to the level of plain error. Barnes at 27. Because we find no plain error, we also reject appellant's contention that appellee committed prosecutorial misconduct through the above alleged errors. Smith at ¶ 45; Bray at ¶ 11. Likewise, based on the above, appellant's defense attorneys did not render ineffective assistance. Strickland at 694. Thus, we overrule appellant's first, second, and third supplemental assignments of error.
 {¶ 65} In her first assignment of error from her original merit brief, appellant contends that her convictions are against the manifest weight of the evidence. We disagree.
 {¶ 66} In determining whether a verdict is against the manifest of the evidence, we sit as a "thirteenth juror." Statev. Thompkins (1997), 78 Ohio St.3d 380, 387. Thus, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id. Additionally, we determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quoting State v. Martin (1983),20 Ohio App.3d 172, 175. We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction." Thompkins at 387, quoting Martin at 175. Moreover, "`it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" State v. Brown, Franklin App. No. 02AP-11, 2002-Ohio-5345, at ¶ 10, quoting State v. Long (Feb. 6, 1997), Franklin App. No. 96APA04-511.
 {¶ 67} In claiming that her convictions are against the manifest weight of the evidence, appellant argues against the credibility of Campbell and Feasel. We acknowledge, for example, that Campbell and Feasel provided inconsistent testimony as to the amount of bloodstained money that appellant displayed. We also acknowledge that appellant's defense attorneys impeached Feasel's credibility with his: (1) statement that he hoped appellee would help him with his municipal court arrest warrant; (2) prior convictions; and (3) admission that he lied to police about crack cocaine activity at the December party. However, we cannot say that the jury lost its way in considering the bloodstained money because both Campbell and Feasel separately verified that appellant did display bloodstained money. We further note that, although appellant ultimately denied displaying bloodstained money at the December party, she once told police that she had bloodstained money after the incident.
 {¶ 68} We also acknowledge that appellant's defense attorneys impeached the credibility of Campbell by presenting Thompson's testimony that Campbell confessed to murdering Brown. However, Thompson's testimony is inconsistent with statements contained in a poem Campbell wrote and read to fellow inmates.
 {¶ 69} Appellant's defense attorneys also impeached Campbell with her decision to testify against appellant in exchange for a plea bargain, and with her admission that she originally lied to police about what happened during the morning of Brown's murder. However, we determine that such issues do not make appellant's convictions against the manifest weight of the evidence because, as noted above, physical and testimonial evidence corroborates Campbell's version of events that appellant murdered Brown as a principal offender while committing a theft offense.
 {¶ 70} We also note that the jury heard evidence that discounted appellant's testimony, thereby properly allowing the jury to disregard the testimony. In particular, appellant has a prior conviction for unauthorized use of property, a crime involving dishonesty. See Washington v. BancOhio Natl. Bank
(1985), 21 Ohio App.3d 234, syllabus. Moreover, appellant provided inconsistent statements as to who was culpable for Brown's murder. Specifically, although appellant testified that Campbell stabbed Brown, she once tried to blame Schoenberger for the incident. Additionally, while appellant testified that she sustained serious trauma to her nose from the incident, Maynard testified that she did not see any injury to appellant's nose when Maynard saw appellant on December 16, 2002. Further, appellant, not Campbell, had visible signs of a struggle.
 {¶ 71} Accordingly, we conclude that appellant's convictions are not against the manifest weight of the evidence. Thus, we overrule appellant's first assignment of error from her original merit brief.
 {¶ 72} Appellant's second assignment of error from her original merit brief concerns her prison sentences. As noted above, the trial court imposed a three-year sentence for appellant's first-degree felony aggravated robbery conviction, which constitutes the minimum authorized prison sentence for first-degree felonies. R.C. 2929.14(A). The trial court also imposed a one-year sentence for appellant's third-degree tampering with evidence conviction, the minimum authorized prison sentence for third-degree felonies. R.C. 2929.14(A). Lastly, the trial court imposed a 30-years-to-life sentence for appellant's aggravated murder conviction. The trial court imposed the aggravated murder sentence upon the jury's recommendation, pursuant to R.C. 2929.03(D)(2), which provides:
If the trial jury recommends that the offender be sentenced to * * * life imprisonment with parole eligibility after serving thirty full years of imprisonment, the court shall impose the sentence recommended by the jury upon the offender. * * *
The trial court ordered appellant to serve the above sentences consecutively.
 {¶ 73} In challenging her sentences, appellant first contends that the evidence did not support the jury's recommendation to impose 30 years to life on the aggravated murder conviction. However, R.C. 2953.08(D) precludes such an evidentiary review of the aggravated murder sentence the trial court imposed pursuant to R.C. 2929.03(D)(2). See State v. Porterfield,106 Ohio St.3d 5, 2005-Ohio-3095, at ¶ 17.
 {¶ 74} Next, appellant argues that, "[w]hen the jury in the instant case `deadlocked' * * * as to its findings regarding its recommendation to impose the death penalty in this case, the 30-years-to-life imposed instead effectively became the maximum allowable sentence under Ohio's sentencing scheme." In support, appellant relies on Blakely v. Washington (2004), 542 U.S. 296; and Apprendi v. New Jersey (2000), 530 U.S. 466. In Apprendi,
the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. Otherwise, the sentence violates a defendant's right to a jury trial under the Sixth Amendment to the United States Constitution and Fourteenth Amendment due process guarantees. Apprendi at 476-478, 497. In Blakely, the United States Supreme Court defined "`statutory maximum' for Apprendi purposes" as "the maximum sentence a judge may impose solely on the basis of thefacts reflected in the jury verdict or admitted by thedefendant." (Emphasis sic.) Blakely at 303.
 {¶ 75} Here, the trial court imposed the minimum authorized prison sentences on appellant's aggravated robbery and tampering with evidence convictions, and appellant makes no argument challenging those specific minimum sentences. Rather, appellant argues that, under Blakely and Apprendi, she could serve no more than a total of 30 years to life imprisonment. Thus, appellant seemingly argues that, under Blakely and Apprendi,
the trial court could not order appellant to serve the sentences on the aggravated robbery and tampering with evidence convictions consecutive to each other and consecutive to the aggravated murder sentence because the jury did not make, and appellant did not admit to, findings to allow such consecutive sentences.
 {¶ 76} R.C. 2929.14(E)(4) governs when trial courts may impose consecutive sentences and states, in pertinent part:
If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18
of the Revised Code, or was under post-release control for a prior offense.
(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
 {¶ 77} However, in State v. Abdul-Mumin, Franklin App. No. 04AP-485, 2005-Ohio-522, we held that consecutive sentences do not implicate Apprendi and Blakely. Abdul-Mumin at ¶ 30. Rather, we recognized that federal courts have consistently upheld consecutive sentences under constitutional scrutiny where, as here, "the individual sentence for each count does not exceed the statutory maximum for the corresponding offense." Id. Therefore, we conclude that the trial court did not impose consecutive sentences in contravention of Apprendi andBlakely or appellant's Sixth Amendment right to a jury trial.
 {¶ 78} Accordingly, based on the above, we reject appellant's contention that the trial court erroneously sentenced appellant. As such, we overrule appellant's second assignment of error from her original merit brief.
 {¶ 79} In summary, we overrule appellant's first and second assignments of error in her original merit brief, and her first, second, and third supplemental assignments of error. Accordingly, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Bryant and McGrath, JJ., concur.