[Cite as *State v. Patterson*, 2013-Ohio-1647.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | |
| | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | Hon. Patricia A. Delaney, J. |
| | Hon. Craig R. Baldwin, J. |
| -vs- | |
| | Case No. 2012CA00098 |
| JONATHAN T. PATTERSON | |
| | |
| Defendant-Appellant | O P I N I O N |


| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Stark County Court of Common Pleas, Case No. 2011CR1240A |
| | |
| JUDGMENT: | Affirmed |
| | |
| DATE OF JUDGMENT ENTRY: | April 22, 2013 |


APPEARANCES:

| | |
|---|---|
| For Defendant-Appellant: | For Plaintiff-Appellee: |
| | |
| GEORGE URBAN | JOHN D. FERRERO |
| 116 Cleveland Ave., NW, Suite 808 | Prosecuting Attorney |
| Canton, OH 44702 | KATHLEEN TATARSKY |
| 116 Cleveland Ave. NW, Suite 808 | Assistant Prosecuting Attorney |
| Canton, OH 44702 | 110 Central Plaza South – Suite 510 |
| | Canton, OH 44702-1413 |

*Baldwin, J.*

{¶1}   Appellant Jonathan T. Patterson appeals a judgment of the Stark County Common Pleas Court convicting him of aggravated murder (R.C. 2903.01(B)) with a death penalty specification (R.C. 2929.04(A)(7)) and a firearm specification (R.C. 2941.145), and aggravated burglary (R.C. 2911.11(A)(1),(2)) with a firearm specification.   He was sentenced to life in prison without possibility of parole. Appellee is the State of Ohio.

{¶2}   On August 14, 2011, seventeen-year-old Chris Reid woke up at his home on 10th Street N.W. in Canton, Ohio, when his friends D'Von Saunders and appellant, who Reid knew by the street name of "J Pat," came into his bedroom. Appellant was eighteen years old at the time. He and Saunders were driving a blue Chrysler Sebring convertible they got the night before at a party.   They asked Reid where they could "get to lick on some weed."   Reid understood this to mean they wanted to rob someone for marijuana.  When Reid could not help them, they left.

{¶3}   Myron Roberson called appellant looking for a ride.   After picking up Roberson, they parked the car and began to walk around the neighborhood near 9th and 10th Streets with Ronnie Lawson and Jentry Ross. Ross was looking for a ride to the Chips Apartments because his "baby mom" and daughter were on their way from Columbus.  The group discussed robbing someone for marijuana and for gas money to get to Chips.

{¶4}   The five boys ended up at the home of Melvin Hope on 11th Street.  They knocked on the door and when Hope answered, they asked for Hope's two sons, Melvin and Jeremy.  He replied that the boys were not home.  Saunders smelled weed

when Hope opened the door. Saunders also told the group that there were "bands in the house," meaning a stack of bills of over $5,000.

{¶5} The group walked to Westbrook Park frustrated because some of them wanted to rob someone for money and drugs, and some did not want to rob anyone. Appellant wanted to rob someone and said, "I'm going to get some money." Saunders gave appellant a .22 caliber Heritage Rough Rider revolver with an obliterated serial number.

{¶6} Appellant and Roberson went to Hope's house and rushed the door. Roberson saw the handle of the revolver on appellant's hip and saw appellant wrestling with Hope. He heard a "pop," followed by two more "pops." Roberson was heading up the stairs at the time, but ran away after hearing the pops. He heard Hope screaming for help, saying, "I ain't got no money. I ain't got nothing."

{¶7} Appellant eventually caught up with Roberson on the street. Appellant was carrying a jewelry box and a penny jar. They rejoined Saunders, Ross and Lawson.

{¶8} The group headed to the Chips Apartments in the blue convertible. Saunders could tell something had happened. Saunders took the gun which appellant had placed under the car seat, wiped it off, wrapped it in his black t-shirt and put it under the driver's seat. In the car, Roberson said, "this shit crazy." When Lawson asked what was crazy, appellant told him to shut up. While the group was at Chips, Roberson burned the "beater," or tank top, appellant was wearing.

{¶9} Appellant, Saunders, Roberson and DeMarco Wright went to the home of Wright's girlfriend, Davian Jackson, to see Wright's baby, who was six or seven

months old. Davian was excited to see Wright as he usually doesn't come by to visit in the summer. Saunders handed her the jewelry box taken from Hope's home and told her to keep it in her room. Several of the boys went in the kitchen where Davian's mother was making dinner, but appellant stayed in the living room. The boys eventually left for Chips, taking the baby with them. The boys returned the baby to Davian's house shortly thereafter.

{¶10} In the car, appellant stated in reference to Hope that he "bodied him," meaning that he killed him. He told Wright that he and Roberson went into a house intending to rob the man who lived there and the "dude end up getting shot." He admitted to Wright that he shot Hope. He also told Wright that he left the gun under the couch in Davian's house.

{¶11} Meanwhile, Chris Reid was playing video games at his house with Jeremy and Melvin Collins, who were Hope's sons. Reid told Melvin to get another game controller from his house. Melvin left and then texted Jeremy from his house, "dad hurt."

{¶12} Canton City Patrolman Scott Fout was dispatched to the Hope home in response to a report of a shooting. He noted a sofa table with items knocked off and found Hope lying in a pool of blood in an archway between the dining room and living room. Hope was conscious, but suffering from gunshot wounds to his chest and leg. Fout searched the home and found a blood trail going to the basement and a large puddle of blood at the bottom of the basement steps. He found no shell casings, leading him to conclude that the gun used was a revolver. He found no signs of

forced entry. The master bedroom of Hope's home had been ransacked and something square appeared to be missing from a cluttered dresser top.

{¶13} Hope was transported to Mercy Medical Center where he died. The coroner found multiple close range gunshot wounds to Hope's body. One was found on the left upper chest and was partially surrounded by soot and by blackening and searing of the skin, indicating that the barrel of the gun was placed close to the skin. This shot went through his lungs, filling the lung cavity with blood so he could not breathe. Hope's body was accompanied to the coroner's office by three containers of blood which were pumped from his body in an effort to save him. Another wound was found in his back, also bearing signs that it was fired at close range. A third gunshot wound was found on his thigh, which broke his right thigh bone. Hope had several injuries to his face, possibly caused by a bullet or by impact from falling down a flight of steps.

{¶14} Chris Reid's mother gave police a description of the car Saunders and appellant were driving when they came to her home on the day of the murder. The police were able to obtain a license plate number because the car had been reported stolen. Canton police officer Victoria Sellers spotted the car at 8:46 p.m. by the entrance to Maggiore's Drive Thru, across the street from a Huntington Bank branch. Appellant was in Maggiore's wearing a white shirt and red shorts. A store clerk told Sellers that appellant had arrived in the Sebring. Appellant walked across the street to the bank. Appellant and Wright were arrested.

{¶15} Two days later, a landscaper found appellant's identification card along with a Huntington Bank ATM card belonging to Hope on the bank lawn.

{¶16} Appellant was indicted by the Stark County Grand Jury with one count of aggravated murder with a death penalty specification and a firearm specification, and one count of aggravated burglary with a firearm specification. The case proceeded to jury trial in the Stark County Common Pleas Court. Appellant was convicted as charged, and the case proceeded to a separate penalty trial.

{¶17} The jury returned with a decision that the aggravating circumstances of the killing did not outweigh the mitigating factors and spared appellant from the death penalty. The jury recommended a sentenced of life in prison without the possibility of parole. The court sentenced appellant to life without parole for aggravated murder and three years for the firearm specification. The court sentenced appellant to ten years incarceration for aggravated burglary, to be served consecutively. The court merged the firearm specification for aggravated burglary into the firearm specification for aggravated murder.

{¶18} Appellant raises five Assignments of Error:

{¶19} "I. APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

{¶20} "II. THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING GRUESOME PHOTOS WHICH WERE INFLAMMATORY AND HIGHLY PREJUDICIAL.

{¶21} "III. APPELLANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION WHEN THE TRIAL COURT

ALLOWED THE PROSECUTOR A CONTINUANCE TO SPEAK WITH A WITNESS THAT HAD ALREADY BEEN SWORN.

{¶22} "IV. APPELLANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND OF ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION BECAUSE HIS TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE.

{¶23} "V. APPELLANT'S SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

I.

{¶24} In his first assignment of error, appellant argues that the judgment convicting him of aggravated murder was against the manifest weight and sufficiency of the evidence. He specifically argues that the evidence did not demonstrate that he acted with purpose because he did not enter the residence intending to kill Hope, that the testimony of Roberson that appellant was the principal offender was not credible, and that the evidence did not show that he possessed the gun.

{¶25} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St. 3d 380, 387,

1997-Ohio-52, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1983).

{¶26} An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E.2d 492, paragraph two of the syllabus (1991).

{¶27} Appellant was convicted of aggravated murder in violation of R.C. 2903.01(B):

{¶28} "(B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape."

{¶29} The jury also found that appellant was the principal offender pursuant to the death penalty specification found in R.C. 2929.04(A)(7):

{¶30} "The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."

{¶31} Appellant was also convicted of a firearm specification in violation of R.C. 2941.145(A), which provides in pertinent part:

{¶32} "(A) Imposition of a three-year mandatory prison term upon an offender under division (B)(1)(a) of section 2929.14 of the Revised Code is precluded unless the indictment, count in the indictment, or information charging the offense specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

{¶33} Appellant first argues that the evidence does not support a finding that he purposely caused the death of Hope.  Purposely is defined by R.C. 2901.22(A):

{¶34} "(A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."

{¶35} Appellant argues that there is no evidence that when he entered the Hope residence, he intended to kill Mr. Hope.  However, the definition of purposely does not require that he have intended to kill Hope when he entered the residence.  There is evidence that supports the jury's finding that appellant pulled the trigger of the gun intending to kill Mr. Hope.  Larry Mackey of the Stark County Crime Laboratory tested the gun and testified that it was a single action revolver, meaning the shooter would have to pull the hammer of the gun and then pull the trigger each time to expel a bullet. Three bullets were removed from Hope's body.  There was evidence that the gunshot

wound to Hope's left upper chest was partially surrounded by soot and the skin was somewhat seared and blackened in the area, which demonstrated that the barrel of the gun was placed close to the skin. The bullet wound on Hope's back also had gunpowder surrounding it, which demonstrated that it was a very close gunshot wound. From this evidence, the jury could conclude that appellant purposely caused the death of Hope, and the jury's finding is not against the manifest weight of the evidence.

{¶36} Appellant next argues that there was no credible evidence to prove that he was the principal offender. He argues that Roberson's testimony is not credible because his charge of complicity to aggravated murder was amended to complicity to murder in exchange for his testimony against appellant. He argues Roberson had previously lied to police, that he was the only one who heard appellant say he "bodied" Hope, and that Roberson's behavior in burning appellant's shirt and his nervousness on the day of the shooting is consistent with Roberson being the principal offender.

{¶37} Roberson testified that when he and appellant entered the Hope residence, he could see a gun handle on appellant's hip. While in the residence, Roberson testified that he heard several "pops" and then he fled the home. Roberson testified that appellant later said he "bodied" Hope, meaning he killed him.

{¶38} While there are inconsistencies between the testimony of the witnesses concerning what happened on the day in question, Roberson's testimony is not the only testimony supporting the jury's finding that appellant was the principal offender. DeMarco Wright testified that appellant admitted to him that he shot Hope. D'Von Saunders testified that he gave appellant the gun and that appellant planned to rob someone to get some money. Further, appellant's shorts were tested. Lead residue

was found in the right front pocket and Hope's blood was found in several areas of appellant's shorts.

{¶39} Roberson testified concerning his plea agreement with the state and admitted to lying to the police in a previous statement. However, the jury had the opportunity to assess Roberson's credibility on the stand and apparently determined he was telling the truth at trial. Based on the evidence presented, the finding that appellant was the principal offender is not against the manifest weight or sufficiency of the evidence.

{¶40} Finally, appellant argues the evidence does not demonstrate that he possessed the gun. Saunders testified that he gave appellant the gun. Roberson testified that he saw the handle sticking out of appellant's shorts. Appellant admitted to Wright that he hid the gun under Davian's couch, where police eventually recovered the gun. Lead residue was found in the right front pocket of appellant's shorts. The finding that appellant possessed a firearm during the commission of the offense is not against the manifest weight or sufficiency of the evidence.

{¶41} The first assignment of error is overruled.

II.

{¶42} In his second assignment of error, appellant argues that the court abused its discretion in admitting State's Exhibit 18F into evidence, which is an autopsy photograph showing plastic containers of blood withdrawn at the hospital in an effort to save Hope's life. Appellant argues the photo has no probative value and its only purpose was to inflame the emotions of the jury.

{¶43} The admission of photographic evidence is left to the discretion of the trial court. *State v. Maurer*, 15 Ohio St.3d 239, 264, 473 N.E.2d 768, 791 (1984); *State v. Morales*, 32 Ohio St.3d 252, 257, 513 N.E.2d 267, 273 (1987). In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶44} Relevant, non-repetitive photographs, even if gruesome, are admissible if the probative value of each photograph exceeds the prejudicial impact to the accused. *Maurer,* supra, at paragraph seven of the syllabus; *Morales,* supra, at 257.

{¶45} The photograph in question shows three plastic hospital containers sitting on the autopsy table near the lower half of Hope's body. In overruling appellant's objection to this photo, the trial court stated:

{¶46} "And I would include in that that Exhibit 18F is probably the least gruesome of all the photos in the entire array because it doesn't show anything other than the fact that it shows some vials on a table of some type. I can't even tell what they are."

{¶47} Having viewed the photograph, we agree with the court's description of the photograph. Further, the coroner testified that the containers of blood depicted in the photograph were important to his determination as to the cause of death, because the amount of blood pumped out of Hope supported the fact that he probably bled to death from his lungs and other wounds. Tr. 1167-1168.

{¶48} The trial court did not abuse its discretion in determining that the probative value of Exhibit 18F outweighed its prejudicial effect. The second assignment of error is overruled.

III.

{¶49} In his third assignment of error, appellant argues the court erred in allowing the State to have a continuance to talk to Roberson after he had been sworn as a witness.

{¶50} After Roberson had been sworn in as a witness, he answered questions concerning how long he had known appellant and the details of his plea agreement. The State asked him to explain where he was and what he was doing at the beginning of the day of the murder. Roberson said, "I don't want to talk." Tr. 877. The court gave the State a short recess to talk to Roberson. The record reflects that the court recessed at 1:28 p.m. and reconvened at 1:38 p.m. Later in the trial, the State put on the record what occurred during this recess. The State represented that Roberson was reminded that the terms of his plea agreement required his truthful testimony. His mother did most of the talking, and urged him to "be a man" and do the right thing. Tr. 1147. She further told Roberson not to look at appellant while testifying, and that she wanted him to do the right thing for the sake of the victim's family and so he would have a chance to get out of prison when he is 36 or 37 years old. Tr. 1148. The State further noted that the conversation took about six minutes and Roberson was crying while his mother talked to him.

{¶51} We first note that appellant did not object to the recess to allow the State to talk to Roberson. Because appellant failed to object, we must find plain error in

order to reverse. To prevail under a plain error analysis, appellant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978). Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

{¶52} While appellant argues that this was a continuance, the record reflects that the State was not given a continuance, but rather the court recessed for ten minutes to allow the State to talk to Roberson. In *State v. Heiberger*, 6th Dist. No. E-84-54, 1985 WL 7544 (July 19, 1985), the court granted the state a recess to allow the fourteen-year-old victim-witness to talk to her caseworker to calm the witness down. The Court of Appeals for the Sixth District found that the conduct of trial proceedings is largely discretionary with the trial court. *Id.* The court held that the record reflected that the witness was very nervous, the defendant was permitted to cross-examine her concerning what happened during the recess, and the record did not reflect that the witness had been coached; therefore, the defendant failed to demonstrate prejudice. *Id.*

{¶53} In the instant case, appellant cross-examined Roberson about what occurred during the recess. Tr. 903-905. The record reflects that Roberson was merely reminded of his plea agreement and his mother urged him to follow through with his agreement to testify truthfully against appellant. Appellant has not demonstrated plain error in this ten-minute recess.

{¶54} The third assignment of error is overruled.

IV.

{¶55} In his fourth assignment of error, appellant argues that his counsel was ineffective for failing to object to jury instructions on R.C. 2929.04(A)(7) which omitted the element of prior calculation and design, and for failing to object to the State's amendment of the indictment for aggravated burglary which eliminated the "aid and abet" language. He argues that the combination of these errors gave the jury no opportunity to find that appellant was not the principal offender, and the jury was faced with a choice of finding him not guilty or finding that he was the principal offender.

{¶56} A properly licensed attorney is presumed competent. *State v. Hamblin*, 37 Ohio St.3d 153, 524 N.E.2d 476 (1988). Therefore, in order to prevail on a claim of ineffective assistance of counsel, appellant must show counsel's performance fell below an objective standard of reasonable representation and but for counsel's error, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). In other words, appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

{¶57} The death penalty specification found in R.C. 2929.04(A)(7) provides, "The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and

design." However, the indictment charged appellant solely with being the principal offender and did not include the statutory language concerning prior calculation and design. The trial court's instruction used the language in the indictment and required the jury to find that appellant was the principal offender to find him guilty of the specification. Presenting the jury with the language concerning prior calculation and design would have created confusion, as the State's theory of the case was that appellant was the principal offender, and appellant's theory of the case was that he was not the principal offender.

{¶58} Further, appellant cannot demonstrate that he was prejudiced by the State's amendment to the indictment to remove the "aid and abet" element of aggravated burglary. If the jury accepted appellant's defense that he was not the principal offender, the jury would have had no choice but to acquit appellant. The removal of the aid and abet language thus aided appellant's defense.

{¶59} The instructions squarely set before the jury the issue presented at trial: whether appellant was the principal offender. Appellant has not demonstrated that counsel was ineffective for failing to object to the instructions.

{¶60} The fourth assignment of error is overruled.

V.

{¶61} In his final assignment of error, appellant argues that the sentence of life imprisonment without parole is against the manifest weight of the evidence.

{¶62} Appellant was sentenced to life without the possibility of parole pursuant to R.C. 2929.03(D)(2), which provides in pertinent part:

{¶63} "(2) Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to one of the following:

{¶64} "(a) Except as provided in division (D)(2)(b) or (c) of this section, to life imprisonment without parole, life imprisonment with parole eligibility after serving twenty-five full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment ***

{¶65} "If the trial jury recommends that the offender be sentenced to life imprisonment without parole, life imprisonment with parole eligibility after serving twenty-five full years of imprisonment, life imprisonment with parole eligibility after serving thirty full years of imprisonment, or an indefinite term consisting of a minimum term of thirty years and a maximum term of life imprisonment to be imposed pursuant to division (B)(3) of section 2971.03 of the Revised Code, the court shall impose the sentence recommended by the jury upon the offender."

{¶66} Pursuant to this section, the court has no discretion in imposing the sentence recommended by the jury; the statute expressly states that the court shall impose the sentence recommended by the jury.

{¶67} R.C. 2953.08(D) governs review of felony sentencing. R.C. 2953.08(D)(3) provides, "A sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review under this section." The Ohio Supreme Court has held that this is unambiguous: a sentence for aggravated murder imposed pursuant to R.C. 2929.02 to R.C. 2929.06 cannot be reviewed. *State v. Porterfield*, 106 Ohio St. 3d 5, 829 N.E.2d 690, 2005-Ohio-3095, ¶17. Therefore, evidentiary review of a sentence imposed by a trial court pursuant to R.C. 2929.03(D)(2) is precluded. *State v. McDowell*, 10th Dist. No. 03AP-1187, 2005-Ohio-6959, ¶73, overruled on other grounds, *In re Ohio Criminal Sentencing Statutes Cases*, 109 Ohio St.3d 411, 848 N.E.2d 809, 2006-Ohio-2394 .

{¶68} The Court of Appeals for the 8th District discussed the longstanding history of treating aggravated murder sentencing differently from other felony sentencing in concluding that a sentence of life imprisonment without parole imposed by a three-judge panel pursuant to R.C. 2929.03 is not reviewable by the appellate court:

{¶69} "The General Assembly's practice of treating sentencing for aggravated murder and murder convictions differently from other felonies is longstanding. Before the 1996 Senate Bill 2 felony sentencing amendments, the courts likewise held that the general felony sentencing requirements did not apply in aggravated murder cases. *E.g., State v. Richards* (Dec. 15, 1997), Clermont App. No. CA97-06-059, unreported,

1997 WL 779084. Defendant has shown nothing to indicate that the General Assembly intended to change this well-established sentencing practice and the comprehensive sentencing scheme in aggravated murder and murder cases." *State v. Hollingsworth*, 143 Ohio App. 3d 562, 569, 758 N.E.2d 713 (8th Dist. 2001).

{¶70} Pursuant to R.C. 2953.08(D)(3) and case law interpreting this statute, this Court is without statutory authority to review appellant's sentence on an evidentiary basis. The fifth assignment of error is overruled.

{¶71} The judgment of the Stark County Common Pleas Court is affirmed. Costs assessed to appellant.


By: Baldwin, J.

Gwin, P.J. and

Delaney, J. concur.


HON. CRAIG R. BALDWIN


HON. W. SCOTT GWIN


HON. PATRICIA A. DELANEY


CRB/rad

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO

FIFTH APPELLATE DISTRICT

|  |  |  |  |
|---|---|---|---|
| STATE OF OHIO | : | | |
| | : | | |
| Plaintiff - Appellee | : | JUDGMENT ENTRY | |
| | : | | |
| -vs- | : | | |
| | : | Case No.   2012CA0098 | |
| JONATHAN T. PATTERSON | : | | |
| | : | | |
| Defendant - Appellant | : | | |
| | : | | |

For the reasons stated in our accompanying Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to Appellant.


_____
HON. CRAIG R. BALDWIN


_____
HON. W. SCOTT GWIN


_____
HON. PATRICIA A. DELANEY